***FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER***

Electronically Filed
Supreme Court
SCOT-17-0000526
15-MAY-2020
10:31 AM

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

LĀNAʻIANS FOR SENSIBLE GROWTH, Intervenor-Appellant,

vs.

LAND USE COMMISSION, COUNTY OF MAUI DEPARTMENT OF PLANNING,
STATE OFFICE OF PLANNING, Appellees,

and

LĀNAʻI RESORTS, LLC, Petitioner-Appellee.

SCOT-17-0000526

APPEAL FROM THE LAND USE COMMISSION
(Agency Docket No. A89-649)

MAY 15, 2020

McKENNA, POLLACK, JJ., WITH WILSON, J., JOINING IN PARTS I—
III(A)-(D) AND DISSENTING IN PARTS III(E) AND IV, AND WITH
RECKTENWALD, C.J., CONCURRING IN THE JUDGMENT AND DISSENTING,
WITH WHOM NAKAYAMA, J., JOINS

OPINION OF THE COURT BY POLLACK, J.,
EXCEPT AS TO PARTS III(E) AND IV

In 2017, the Land Use Commission of the State of

Hawaiʻi determined that, when it prohibited a resort from

irrigating its golf course with "potable" water as a condition

of its administrative order issued almost thirty years earlier, it did not mean "potable" by any common definition of the term. Instead, the Land Use Commission found that the term was intended to carry a special meaning that the Commission does not define--other than to say it excludes brackish water that contains chlorides over an unspecified level. Based upon this special interpretation of "potable," the Land Use Commission determined that the resort had not violated the administrative order. But neither the text of its administrative order nor the circumstances in which it was adopted offer any reason to depart from the plain meaning of the condition, which was intended to prohibit the resort from watering its golf course with water that is suitable for drinking under county water quality standards. This plain meaning is consistent with the common meaning of "potable" that this court recognized in its previous ruling in this case and serves to fulfill the constitutional duties with which the Land Use Commission is presumed to have complied.

We thus conclude that the Land Use Commission erred in its 2017 Order by interpreting a condition in its administrative order to mean that brackish water is per se "non-potable." Accordingly, we also consider whether the Commission erred in determining that the resort did not violate this condition under its plain meaning, which prohibits the utilization for golf

course irrigation water suitable for drinking under the county's water quality standards.

## I. BACKGROUND

### A. The Initial Proceedings and the 1991 LUC Order

This case began in November 1989, when Lānaʻi Resorts (the Resort) filed a Petition for Land Use District Boundary Amendment (Petition) with the Land Use Commission of the State of Hawaiʻi (LUC).[1] The Petition sought "to effect district reclassification" of a large tract of rural and agricultural land so that the Resort could build an eighteen-hole golf course in Mānele on the island of Lānaʻi. The LUC permitted Lānaʻians for Sensible Growth (LSG) to intervene in the matter.[2] In April 1991, after six days of hearings, the LUC issued an order approving the Resort's Petition subject to several conditions (1991 LUC Order). Among these conditions was Condition 10, which gave rise to the litigation now before this court. Condition 10 states that the Resort is not allowed to use potable water to irrigate the golf course:

---

[1] Several entities have owned the Resort since the original boundary amendment proceedings in 1989. For clarity, these entities are collectively referred to as "the Resort."

[2] LSG is "an unincorporated association of Lanai residents" who "used the subject property for hiking, subsistence and recreational fishing, and for the enjoyment and appreciation of the ancient Hawaiian archaeological sites located there."

> 10. [The Resort] shall not utilize the potable water from the high-level groundwater aquifer for golf course irrigation use, and shall instead develop and utilize only alternative non-potable sources of water (e.g., brackish water, reclaimed sewage effluent) for golf course irrigation requirements.
>
> In addition, [the Resort] shall comply with the requirements imposed upon [it] by the State Commission on Water Resource Management as outlined in the State Commission on Water Resource Management's Resubmittal – Petition for Designating the Island of Lanai as a Water Management Area, dated March 29, 1990.

(Emphasis added.)  The "Resubmittal" referred to in the second paragraph of Condition 10 refers to the State Commission on Water Resource Management's (CWRM) March 1990 recommendation against designating the island of Lānaʻi as a water management area.[3]

### B. The 1996 LUC Order

In October 1993, the LUC issued an Order to Show Cause (OSC) to the Resort, directing it to show why certain portions of its golf course should not revert to their former land use classification or otherwise be changed to a more appropriate classification.  The OSC stated that the LUC had reason to believe the Resort had failed to comply with Condition 10's requirement that it develop and utilize alternative sources of non-potable water for golf course irrigation.

---

[3]  In May 1989, the CWRM received a "petition to designate the Island of Lanai as a Water Management Area for the purpose of regulating the use of ground-water resources" because the "resort development on Lanai in the future would cause water demand to exceed the available water supply."

Following twelve days of hearings regarding the OSC, the LUC issued its Findings of Fact, Conclusions of Law, and Decision and Order (1996 LUC Order). The LUC found that the Resort was irrigating the golf course primarily with non-potable, brackish water from two wells located within the high level aquifer: Well 1 and Well 9.[4] The LUC concluded that this use did not comply with Condition 10 and accordingly ordered the Resort to "immediately cease and desist any use of water from the high level aquifer for golf course irrigation requirements."

The Resort appealed the LUC's decision to the Circuit Court of the Second Circuit, which reversed the 1996 LUC Order. See Lanai Co. v. Land Use Comm'n, 105 Hawai'i 296, 306, 97 P.3d 372, 382 (2004). We affirmed on review, holding that "the LUC erred in interpreting Condition No. 10 as precluding the use of 'any' or all water from the high level aquifer." Id. at 319, 97 P.3d at 395. This court explained that Condition 10 bars the use of only potable water from the high-level aquifer, and it allows the Resort to use non-potable water for golf course irrigation. Id. at 310, 97 P.3d at 386. We stated that "potable" is ordinarily defined as "suitable for drinking" but

---

[4] Section 20.24.020 of the Maui County Code, the LUC noted, "define[d] potable water as water containing less than 250 milligram per liter of chlorides." Nonetheless, the LUC found that "[t]he potability of any water source does not depend on any particular level of chloride concentration."

noted that the parties disagreed as to the meaning the 1991 LUC intended when it used the term in Condition 10. Id. at 299 n.8, 97 P.3d at 375 n.8 (2004) (quoting Webster's Seventh New Collegiate Dictionary 664 (1965)). The evidence did not conclusively establish that the aquifer contained only potable water, we held, and, indeed, the LUC's findings of fact "suggest[ed] that the use of [Wells 1 and 9], and their brackish water supply, was permissible." Id. at 313, 97 P.3d at 389. Because the 1996 LUC Order was ambiguous, we remanded the case to the LUC "for clarification of its findings . . . as to whether [the Resort] used potable water from the high level aquifer, in violation of Condition No. 10." Id. at 319, 97 P.3d at 395.

### C. The 2010 LUC Order

On remand in 2010, the LUC vacated its 1996 Order and granted the Resort's Motion for Modification of Condition 10 (2010 LUC Order). The newly-modified Condition 10 provided, in relevant part, the following:

> a. [The Resort] shall not use ground water to irrigate the Mānele Golf Course, driving range and other associated landscaping if the chloride concentration measured at the well head is 250 milligrams per liter (250 mg/l) or less.
>
> b. In the event the chloride concentration measurement of ground water to irrigate the Mānele Golf Course, driving range and associated landscaping falls below 250 mg/l, [the Resort] shall cease use of the affected well(s) producing such ground water for irrigation purposes until such time as the chloride concentration measurement of the water drawn from such wells rises above 250 mg/l.

The case was again appealed, and on review the Intermediate Court of Appeals (ICA) held that the 2010 LUC Order was invalid because LSG was not given a "full and fair opportunity to have its evidence heard and considered post-remand." Lanaians for Sensible Growth v. Lanai Resorts, LLC, Nos. CAAP-13-0000314, CAAP-12-0001065, 2016 WL 1123383 (App. Mar. 21, 2016) (mem.).

## D. The 2017 LUC Order

The LUC held further hearings following the second remand and on June 1, 2017, issued the Findings of Fact, Conclusions of Law and Decision and Order that are the subject of this appeal (2017 LUC Order). In determining whether the Resort had violated Condition 10 when it used brackish water from Wells 1 and 9 for golf course irrigation, the LUC explained that the "common sense definition" of potable is "drinkable," and that the word "brackish" means "somewhat salty" and "distasteful."[5] (Quoting Lanai Co., 105 Hawaiʻi at 299 n.10, 97 P.3d at 375 n.10.) Based on testimony from the hearings, the LUC determined that "[w]ater with chloride concentrations above

---

[5] The LUC noted that the Hawaiʻi Department of Health defines "potable water" as "water free from impurities in amounts sufficient to cause disease or harmful physiological effects." The terms potable and non-potable "do not exist in State or federal primary drinking water regulations," the LUC stated.

250 ppm or mg/L is considered 'brackish,'" but water above this threshold "may also be considered 'potable.'"[6]

The LUC noted that the United States Environmental Protection Agency's (EPA) "secondary standards" define "brackish water" as "water having chlorides of 250 mg/L or above." When chloride levels exceed 250 mg/L, the LUC stated, customers begin to complain of "taste issues" and problems arise "with the water system itself such as corrosion and deposits in the pipelines." The LUC also explained that "in practice, county water departments generally limit chloride levels of water within their municipal system to less than 160mg/L, or at most, under the EPA's secondary standard of 250 mg/L."

The LUC found, however, that chlorides are considered to be a "secondary contaminant" because they affect only the "aesthetic qualities" of drinking water. In other words, chloride levels are not regulated by standards designed to protect public health. The Hawaiʻi Department of Health (DOH) would allow public water systems to provide drinking water with chloride levels in excess of 250 mg/L, the LUC found, and some public water systems have done so in the past. It is also "typical," the LUC stated, "for county water supplies to use

_____

[6] One milligram (mg) per liter (l) is equal to one part per million (ppm), and the LUC appears to have used the terms interchangeably.

water pumped at or above 250 ppm in their domestic water systems, blended into other water." There are currently potable wells on Oʻahu that produce water with over 250 mg/L chlorides, the LUC found, and Maui wells have likely also done so in the past. Thus, the LUC reasoned that "it is possible for water with chloride concentrations of greater than 250 ppm to be used as potable water . . . either directly or blended with other potable sources . . . so long as other drinking water standards are met."[7]

Turning to the wells used to irrigate the golf course, the LUC explained that "[f]rom 1948 to present, the documented chloride levels of water from Well 1 have always been greater than 250 mg/L." The LUC found that Well 9 was "connected to the brackish water system" in 1992, and "[f]rom 1993 to present, the documented chloride levels of the water from [the well] have always been greater than 250 mg/L." "No party," the LUC found, "presented any evidence that the chloride levels of either Well 1 or 9 has ever dropped below 250 mg/L." Wells 1 and 9 "draw the only known high-level ground water in the state that is brackish, as opposed to fresh," the LUC stated. And, although

---

[7] The LUC also concluded that "the record contains inconclusive evidence as to the degree to which the pumping of water from Wells 1 and 9 in the Pālāwai Basin may cause the leakage of water from other areas of the high level aquifer that are currently used for potable drinking water."

Wells 1 and 9 had been tested for potability and found to be free of primary contaminants, the LUC determined that they would "not be accepted by the County[ of Maui] as potable wells" due to their chloride levels.

The LUC found that "it was reasonable to conclude that the water from Wells 1 and 9 may be considered 'potable'" under the term's "common sense meaning." The LUC reasoned, however, that when it was used in Condition 10, "potable" had "a special interpretation other than its common or general meaning," as evidenced by the inclusion of "the category of 'brackish' water as a specific example . . . [of] an 'alternate source' of water." Due to the "unique existence of brackish high-level water" in Wells 1 and 9, those involved in the original hearing may have incorrectly assumed that the high level aquifer contained only freshwater, the LUC explained. Thus, "in the specific context of this Docket and Condition 10, 'brackish' water was considered not to be potable," the LUC found, "but rather a source of water 'alternate' to the 'potable' water supplies" found in the high level aquifer.

The LUC therefore concluded that the specific language of Condition 10 indicated that the term "potable" was not used in accordance with its common sense meaning, and the condition "specifically excluded from 'potability' brackish water of a kind that is used elsewhere in these islands for drinking." The

LUC stated that the Resort presented "substantial credible evidence" that the water used to irrigate the golf course "was and is brackish under the specific meaning of the language in Condition 10 in the 1991 [LUC] Order, and therefore an allowable alternate source of water."

The LUC also addressed the public trust doctrine explaining that "[u]nder the public trust, the state has both the authority and duty to preserve the rights of present and future generations in the waters of the state."  (Quoting In re Water Use Permit Applications (Waiāhole I), 94 Hawaiʻi 97, 141, 9 P.3d 409, 443 (2000).)  Additionally, the LUC noted that it was required to "consider whether [the Resort's] use negatively affects past, current or future uses of potable water from the high-level aquifer."  Although the evidence regarding "the potential long-term effect of withdrawals from Wells 1 and 9 on drinking water wells" on Lānaʻi was "ambiguous," the LUC found, "no party [] raised a reasonable allegation of harm against that or any other public trust use of water."  Therefore, the LUC concluded that the Resort "made an affirmative showing that its use of Wells 1 and 9 to irrigate Mānele Golf Course does not conflict and is consistent with public trust principles and purposes."  The 1996 LUC Order was vacated by the 2017 LUC because of its determination that the Resort "proved its

11

compliance with Condition No. 10 by a preponderance of the evidence."

LSG filed a direct appeal from the 2017 LUC Order to this court.

## II. STANDARDS OF REVIEW

Pursuant to Hawai'i Revised Statutes (HRS) § 205-19 (Supp. 2016), this court reviews LUC decisions under the standards set forth in the judicial review provision of the Hawai'i Administrative Procedures Act, HRS § 91-14(g). HRS § 91-14(g) (Supp. 2016) provides as follows:

> Upon review of the record, the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1) In violation of constitutional or statutory provisions;
>
> (2) In excess of the statutory authority or jurisdiction of the agency;
>
> (3) Made upon unlawful procedure;
>
> (4) Affected by other error of law;
>
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

This court has further clarified that

> [c]onclusions of law are reviewed de novo, pursuant to subsections (1), (2) and (4); questions regarding procedural defects are reviewable under subsection (3); findings of fact (FOF) are reviewable under the clearly

12

erroneous standard, pursuant to subsection (5), and an agency's exercise of discretion is reviewed under the arbitrary and capricious standard, pursuant to subsection (6).

Kauai Springs, Inc. v. Planning Comm'n of Kauaʻi, 133 Hawaiʻi 141, 164, 324 P.3d 951, 974 (2014).

### III. DISCUSSION

The 2017 LUC determined that brackish water is per se "non-potable" within the meaning of Condition 10, notwithstanding that this meaning is contrary to the "common sense" definition of the term. However, given the text of Condition 10, the presumption that the 1991 LUC complied with its constitutional public trust duties, and the circumstances in which the condition was adopted, it is apparent that the 1991 LUC intended to use the term "potable" in accordance with its common sense meaning rather than a special interpretation under which water with chloride levels higher than an unspecified number is inherently non-potable. This is to say that Condition 10 prohibits the Resort from irrigating its golf course with water suitable for drinking under the county's water quality standards.

**A. The 2017 LUC's Interpretation of Condition 10 Is Contrary to Its Plain Meaning, Which Prohibits Golf Course Irrigation with Water that Is Suitable for Drinking under County Water Quality Standards.**

The 2017 LUC concluded that the plain language of Condition 10 indicates that, counter to the common sense meaning

13

of its terms, brackish water is necessarily "non-potable" within the meaning of the condition.  In interpreting the text of Condition 10, the general principles of statutory construction apply.  See Boswell v. Brazos Elec. Power Co-op., Inc., 910 S.W.2d 593, 599 (Tex. App. 1995) ("Rules of statutory construction apply equally to the construction of an administrative order.") (citing Trapp v. Shell Oil Co., 198 S.W.2d 424, 439 (Tex. 1946))); State v. Guyton, 135 Hawai'i 372, 378, 351 P.3d 1138, 1144 (2015) (applying canons of statutory construction to a court order); Int'l Bhd. of Elec. Workers, Local 1357 v. Hawaiian Tel. Co., 68 Haw. 316, 323, 713 P.2d 943, 950 (1986) (applying canons of statutory construction to an administrative rule).  If the language of the order is unambiguous and applying it in its literal sense would not produce a result that is absurd, unjust, or at odds with governing law, we are bound to enforce the plain meaning of the administrative order.  See Guyton, 135 Hawai'i at 378, 351 P.3d at 1144.  We are only free to depart from this plain meaning if there is some indication that a term was intended to be "given a special interpretation other than its common and general meaning."  Singleton v. Liquor Comm'n, 111 Hawai'i 234, 244, 140 P.3d 1014, 1024 (2006).

The 2017 LUC found such an indication in the language of Condition 10, which includes brackish water as a possible

14

example of non-potable water. The 2017 LUC expressly acknowledged that the water from Wells 1 and 9 could be considered "potable" under the common sense meaning of the word. It however reasoned that, by stating that the Resort was required to "develop and utilize only alternative non-potable sources of water (e.g., brackish water, reclaimed sewage effluent)," Condition 10 clearly indicated that brackish water was considered "non-potable" for purposes of the condition, and the term must therefore carry a "special interpretation" other than its common sense meaning. (Emphasis added.)

But "e.g.", an abbreviation for the Latin phrase exempli gratia, simply means "for example." Black's Law Dictionary 717 (11th ed. 2019). The inclusion of brackish water following the abbreviation indicates only that brackish water is an example of water that could be "non-potable" if the water qualifies as such under the word's ordinary meaning. In contrast, the term "i.e.", an abbreviation for the Latin phrase id est, means "that is." Black's Law Dictionary 895 (11th ed. 2019). Thus, when a term is meant to be interchangeable with or definitional of an affected term, rather than just a possible example, "i.e." is used. See DePierre v. United States, 564 U.S. 70, 80 (2011) (using "i.e." to demonstrate that cocaine hydrochloride and powder cocaine are the same substance); Droplets, Inc. v. eBay, Inc., No. 2:11-CV-401-JRG-RSP, 2014 WL

4217376 at *7 (E.D. Tex. Aug. 22, 2014) (finding that "i.e." is a definitional expression while "e.g." is merely an explanatory expression); Interval Licensing LLC v. AOL, Inc., 766 F.3d 1364, 1373 (Fed. Cir. 2014) (noting that "i.e." serves as a definitional phrase that provides clarity compared to "e.g." which serves to provide an example); Hoseman v. Weinschneider (In re Weinschneider), 42 Collier Bankr.Cas.2d 1860, 1999 WL 676519, at *3 n.3 (Bankr. N.D. Ill. Aug. 30, 1999) (using "i.e." to demonstrate that a name is interchangeable with an acronym). The 2017 LUC altered the established meaning of "e.g." by finding that brackish water is per se non-potable because the term "e.g." was used. This nullifies the distinction between "i.e." and "e.g." as it converts "e.g." into a definitional phrase, rendering brackish water as an interchangeable term for non-potable.

Thus, the 2017 LUC's interpretation divorces the term "brackish" from Condition 10's overarching requirement that the water utilized by the Resort be non-potable in the first instance. ("[The Resort] shall not utilize the potable water from the high-level groundwater aquifer for golf course irrigation use[.]") Simply being brackish, however, does not make water non-potable within the meaning of Condition 10. The key inquiry is instead whether the water at issue fulfills the common meaning of the term "potable," which this court has

16

stated to be "suitable for drinking." Lanai Co. v. Land Use Comm'n, 105 Hawai'i 296, 299 n.8, 97 P.3d 372, 375 n.8 (2004) (quoting Webster's Seventh New Collegiate Dictionary 664 (1965)). Brackish water is therefore "potable" if it is suitable for drinking under county water quality standards and "non-potable" if it is not.

Tellingly, neither the 2017 LUC nor the Chief Justice's opinion concurring in the judgment and dissenting (minority), which accepts the specialized meaning adopted by the 2017 LUC, has offered an alternative definition of "non-potable."[8] Because they eschew the common definition of the terms of Condition 10 in favor of a "special interpretation," their analysis is untethered to any specific test that can be applied in the future. It is thus wholly unclear what water would qualify as non-potable other than the brackish water and reclaimed sewage effluent that are expressly mentioned in Condition 10.

---

[8] In support of its revamping of the definition of "potable," the minority points to the second paragraph of Condition 10 that requires the Resort to comply with the requirements imposed by the CWRM Resubmittal, which appears to include an authorization for the CWRM chairperson to reinstitute a water-management-area designation proceeding if certain indications of an impending water shortage exist. Minority Op. at 19-20; see infra note 9. But this authorization cannot change the meanings of the terms used in Condition 10, which are fixed based on the LUC's intention at the time the condition was imposed.

Conversely, applying the plain language of Condition 10 in accordance with its common meaning does not produce an absurd or unjust result.  Instead, it effectuates the purpose of Condition 10: to protect Lānaʻi's drinking water supply for use by the general public.  The provision does not expressly identify all brackish water as a permissible source of water for golf course irrigation, nor does it present any other reason to deviate from the plain meaning of its terms.  This court is therefore not at liberty to do so, and we thus reject the 2017 LUC's "special interpretation."

**B. The LUC Is Presumed To Have Complied with Its Constitutional Public Trust Duties, Including the Preservation of Water for Domestic Use.**

The plain reading of Condition 10 is reinforced by the presumption that the LUC complied with its public trust obligations.  Waiāhole I, 94 Hawaiʻi 97, 135, 9 P.3d 409, 447 (2000) ("The public trust is a dual concept of sovereign right and responsibility.").  Under our precedent, "agency decisions affecting public trust resources carry a presumption of validity."  Id. at 143, 9 P.3d at 455.  Thus, logically, if an administrative order is reasonably susceptible to an interpretation that would not meet the agency's public trust obligations and one that would properly fulfill those duties, we are obligated to adopt the latter.  Cf. Morita v. Gorak, 145 Hawaiʻi 385, 391, 453 P.3d 205, 211 (2019); In re Doe, 96 Hawaiʻi

18

73, 81, 26 P.3d 562, 570 (2001) ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is [to] adopt the latter." (quoting Jones v. United States, 529 U.S. 848, 857 (2000))). In other words, the 1991 LUC is presumed to have reviewed and granted the Resort's Petition in a manner that was consistent with its constitutional public trust duties, and this court must interpret Condition 10 in light of this commitment.

As the 2017 LUC recognized, these duties include an obligation to protect and preserve water for domestic use by the public with a particular focus on "protecting an adequate supply of drinking water." Kauai Springs, Inc. v. Planning Comm'n of Kaua'i, 133 Hawai'i 141, 172, 324 P.3d 951, 982 (2014) (citing Waiāhole I, 94 Hawai'i at 136–37, 9 P.3d at 449–50). Further, the LUC possesses a continuing constitutional obligation to ensure that the measures it imposes to protect public trust resources are implemented and complied with. See Kelly v. 1250 Oceanside Partners, 111 Hawai'i 205, 231, 140 P.3d 985, 1011 (2006) (holding that an agency has a continuing public trust duty "not only [to] issue permits after prescribed measures appear to be in compliance with state regulation, but also to ensure that the prescribed measures are actually being implemented").

19

From this perspective, it is apparent that Condition 10 serves to protect and preserve the waters of Lānaʻi for domestic use by prohibiting the Resort from irrigating its golf course with water that would otherwise be used as drinking water. Thus, whether the water in Wells 1 and 9 is "potable" for purposes of Condition 10 would not turn on whether the chloride concentration exceeds a given level--for which there is no evidence that the 1991 LUC contemplated when it first imposed the condition.

Indeed, the 1991 LUC would have violated its public trust duties if it had intended "potable" water to convey the special, non-common sense interpretation adopted by the 2017 LUC and endorsed by the minority. Permitting the Resort an indefinite license to irrigate its golf course using any water with chloride levels in excess of a given level would not adequately preserve and protect Lānaʻi's drinking water supply in the long term because, as technology develops and climate change likely fundamentally alters the availability of fresh water, "brackish" water may become needed for domestic use. It would assuredly be counter to the State's public trust obligations to permit a private commercial resort to irrigate its golf course with water that the public needs for daily living, and the 2017 LUC's special interpretation does little to prevent this outcome. See Waiāhole I, 94 Hawaiʻi at 138, 9 P.3d at 450

20

("[A]lthough its purpose has evolved over time, the public trust has never been understood to safeguard rights of exclusive use for private commercial gain.").

The minority would have this court instead rely on the CWRM's review of the monthly monitoring reports that Condition 10 requires the Resort to submit to hold that the LUC's public trust obligations have been satisfied.[9]  Minority Op. at 19-20.

_____

[9]     Condition 10 states that the Resort shall comply with the conditions set forth in the CWRM Resubmittal, which recommended the following actions to protect Lānaʻi's water supply:

> 1. Require [the Resort] to immediately commence monthly reporting of water use to the [CWRM], under the authority of Chapter 174C-83, HRS, which would include pumpage, water level, temperature, and chloride measurements from all wells and shafts;
>
> 2. In addition to monthly water use reporting and pursuant to Secs. 174C-43 & 44, HRS, require [the Resort] to monitor the hydrologic situation so that if and when ground-water withdrawals reach the 80-percent-of-sustainable-yield rate, the [Resort] can expeditiously institute public informational meetings in collaboration with the [CWRM] to discuss mitigative measures;
>
> 3. Require [the Resort] to formulate a water shortage plan that would outline actions to be taken by the [Resort] in the event a water shortage situation occurs.  This plan shall be approved by the [CWRM] and shall be used in regulating water use on Lanai if the [CWRM] should exercise its declaratory powers of a water emergency pursuant to Section 174C-62(g) of the State Water Code.  A draft of this plan should be available for public and [CWRM] review no later than the beginning of October 1990 and shall be approved by the [CWRM] no later than January 1991;
>
> 4. That the [CWRM] hold annual public informational meetings on Lanai during the month of October to furnish and receive information regarding the island's water conditions.  The public shall be duly notified of such meetings;
>
> 5. Authorize the Chairperson to re-institute water-management-area designation proceedings and, hence, re-

(continued . . .)

While these reports are relevant to the State's continuing public trust duty to monitor the Resort's compliance with Condition 10, the submission of monthly water reports prepared by the Resort would not by itself assure the required level of protection and preservation of Lānaʻi's water resources. Ching v. Case, 145 Hawaiʻi 148, 170, 449 P.3d 1146, 1168 (2019) ("The most basic aspect of the State's trust duties is the obligation 'to protect and maintain the trust property and regulate its use'" which includes a duty "to reasonably monitor the trust property," to ensure that "a trustee fulfills the mandate of 'elementary trust law' that trust property not be permitted to 'fall into ruin on the [the trustee's] watch'" (alteration in original)).

The CWRM's powers are intended to be used to respond to and mitigate a water shortage once it has begun. See HRS

_____

(. . . continued)

> evaluations of ground-water conditions on the island if and when:
>
> a. The state water-level of any production well falls below one-half its original elevation above mean sea level, or
>
> b. Any non-potable alternative source of supply contained in the [Resort's] water development plan fails to materialize and full land development continues as scheduled.
>
> c. Items 1, 2, and 3 are not fulfilled by [the Resort].
>
> d. If source water uses exceeds 4.3 [million gallons per day].

§ 174C-62.[10]  By contrast, Condition 10's prohibition on the use

of potable water serves to help prevent such a shortage from

arising in the first place.  If the "potable" distinction in

Condition 10 is properly interpreted to vary based on whether

---

[10]     HRS § 174C-62 (2011) provides as follows:

(a) The commission shall formulate a plan for implementation during periods of water shortage. As a part of the plan, the commission shall adopt a reasonable system of permit classification according to source of water supply, method of extraction or diversion, use of water, or a combination thereof.

(b) The commission, by rule, may declare that a water shortage exists within all or part of an area when insufficient water is available to meet the requirements of the permit system or when conditions are such as to require a temporary reduction in total water use within the area to protect water resources from serious harm.  The commission shall publish a set of criteria for determining when a water shortage exists.

(c) In accordance with the plan adopted under subsection (a), the commission may impose such restrictions on one or more classes of permits as may be necessary to protect the water resources of the area from serious harm and to restore them to their previous condition.

. . . .

(g) If an emergency condition arises due to a water shortage within any area, whether within or outside of a water management area, and if the commission finds that the restrictions imposed under subsection (c) are not sufficient to protect the public health, safety, or welfare, or the health of animals, fish, or aquatic life, or a public water supply, or recreational, municipal, agricultural, or other reasonable uses, the commission may issue orders reciting the existence of such an emergency and requiring that such actions as the commission deems necessary to meet the emergency be taken, including but not limited to apportioning, rotating, limiting, or prohibiting the use of the water resources of the area.  Any party to whom an emergency order is directed may challenge such an order but shall immediately comply with the order, pending disposition of the party's challenge.  The commission shall give precedence to a hearing on such challenge over all other pending matters.

the water is of a quality that the county water agency would, at that time, deem suitable for domestic use, the provision fulfills the LUC's public trust duty to ensure that the public's use of the limited natural resource is <u>always</u> prioritized over the irrigation of a private commercial golf course, regardless of whether Lāna'i's water supply is actively threatened.[11]  <u>See</u> <u>Kauai Springs, Inc.</u>, 133 Hawai'i at 174, 324 P.3d at 984 (noting that the public trust doctrine obligates an agency to consider "whether the proposed use is consistent with," inter alia, "the protection of domestic water use" and to subject commercial uses to "a high level of scrutiny").  The position asserted by the minority clearly would not protect and preserve the public trust as it concludes that all brackish water is non-potable, thus allowing perpetual commercial use of a public water resource to irrigate the Resort's golf course unless the CWRM determines that there exists a water shortage on Lāna'i of sufficient

---

[11]    County water quality standards necessarily take into consideration the DOH and the EPA's safety regulations.  <u>See</u> Hawai'i Administrative Rules §§ 11-20-2, 11-20-4 to 11-20-7, 11-21-2; 40 C.F.R. §§ 141.2, 141.61-.66 (2020).  However, more than just safety considerations inform a county water agency's evaluation of the suitability of water for domestic use.  A host of secondary considerations such as taste, appearance, odor, the cost and feasibility of purification or other processing, and the availability of alternative sources may affect whether a county water agency views a water source as suited for domestic use.  <u>See</u> EPA, <u>Secondary Drinking Water Standards: Guidance for Nuisance Chemicals</u> (2017) (listing various chemicals that do not threaten water safety but may negatively affect the desirability of water for drinking), https://www.epa.gov/dwstandardsregulations/secondary-drinking-water-standards-guidance-nuisance-chemicals [https://perma.cc/NT4B-6MAE].

severity to require mitigation measures.[12]  The 2017 LUC's interpretation therefore renders Condition 10 ineffectual in preserving Lānaʻi's public water resource for future generations in derogation of the public trust.  Waiāhole I, 94 Hawaiʻi at 139, 9 P.3d at 451 ("The second clause of article XI, section 1 [of the Hawaiʻi Constitution] provides that the state 'shall promote the development and utilization of [water] resources in a manner consistent with their conservation and in furtherance of the self-sufficiency of the State.'" (second alteration in original)).

Further, the interpretation advocated by the minority would rely on the Resort to self-report the composition of the water in Wells 1 and 9.  As we have held, "an agency of the State must perform its statutory function in a manner that fulfills the State's affirmative constitutional obligations." Mauna Kea Anaina Hou v. BLNR, 136 Hawaiʻi 376, 414, 363 P.3d 224, 262 (2015) (opinion of the court as to Part IV by Pollack, J.).

_____

[12]    The minority claims to agree that the Resort is not allowed perpetual use of the water in Wells 1 and 9.  Minority Op. at 11.  Yet its reading of Condition 10 specifically provides for this outcome.  As the minority itself states, "if Wells 1 and 9 were made part of Lānaʻi's potable water system – in other words, if they no longer were 'brackish'," then the Resort "[o]f course" could not use the water.  Minority Op. at 11.  This reading of Condition 10 means that water would have to be no longer brackish for it to be made part of Lānaʻi's potable water system, ignoring the scientific reality that brackish water can be potable.  Consequently, the minority allows the perpetual use of potable water.

The State's affirmative duty to protect and preserve constitutional rights is by its very nature not delegable to a private entity. See Ka Paʻakai O KaʻAina v. Land Use Comm'n, 94 Hawaiʻi 31, 50–51, 7 P.3d 1068, 1087–88 (2000). And, manifestly, it is not reasonable for a trustee to delegate the supervision of a third party's compliance with an agreement that is designed to protect trust property to the third party itself. Ching, 145 Hawaiʻi at 181, 449 P.3d at 1179 ("It is self-evident that, as a general matter, it is not reasonable for a trustee to delegate the supervision of a lessee's compliance with the terms of a lease of trust property to the lessee."); see also In re Estate of Dwight, 67 Haw. 139, 146, 681 P.2d 563, 568 (1984) ("A trustee is under a duty to use the care and skill of a [person] of ordinary prudence to preserve the trust property." (citing Bishop v. Pittman, 33 Haw. 647, 654 (Haw. Terr. 1935))); cf. Halderman v. Pennhurst State Sch. & Hosp., 526 F.Supp. 428, 433 (E.D. Pa. 1981) ("The Commonwealth defendants appear to take the position that they should be able to monitor their own compliance with the Court's Orders. This would be somewhat akin to requesting the fox to guard the henhouse.").

The Hawaiʻi Constitution requires the State to engage in evaluative monitoring of the wells with regard to the county's standards for domestic water usage to protect against the conflict of interest inherent in self-reporting. Ching, 145

Hawaiʻi at 178, 449 P.3d at 1176 (holding that the State has a "constitutional trust obligation" to reasonably monitor the lessee to ensure that the lessee actually complies with the conditions of the lease); Kelly, 111 Hawaiʻi at 231, 140 P.3d at 1011 (concluding that the State had a continuing public trust duty to reasonably monitor the developer to ensure that the permit conditions are being followed). By engaging in reasonable monitoring, the State can thus determine on an ongoing basis whether the Resort has violated Condition 10 by irrigating its golf course with water that the county water agency would at that time deem suitable for domestic use. The 1991 LUC would have fulfilled its public trust duties by crafting such a standard that can evolve with time and contemporary conditions, including the changing environment and developing technologies. Waiāhole I, 94 Hawaiʻi at 137, 9 P.3d at 449 ("[W]e recognize domestic water use as a purpose of the state water resources trust."). This court therefore presumes that the common sense meaning of potable water is indeed what the LUC intended in Condition 10.[13]

---

[13]    As noted, the appeal in this case was taken following our remand to the LUC to determine whether the Resort "was using potable water from the high level aquifer" in violation of Condition 10. Lanai Co., 105 Hawaiʻi at 306, 316, 97 P.3d at 382, 392. Accordingly, this opinion reviews the 2017 LUC's decision on remand and does not consider whether the Resort's prospective use of the water in Wells 1 and 9 complies with the LUC's constitutional public trust obligations to "preserve the rights of present

(continued . . .)

The minority also contends that there is nothing in Condition 10 that expressly provides the Resort with "fair notice" that its authorization to use water from Wells 1 and 9 was subject to changing circumstances. Minority Op. at 4-5. This contention assumes that the Resort was given permanent authorization to use all brackish water in Wells 1 and 9 because all such water is non-potable. It is far more logical to conclude that the Resort would have been on notice that its usage of Wells 1 and 9 for golf course irrigation would no longer be permitted when the water was potable, i.e., suitable for drinking under county water quality standards. As this court has emphasized, "The public trust, by its very nature, does not remain fixed for all time, but must conform to changing needs and circumstances." Waiāhole I, 94 Hawai'i at 135, 9 P.3d at 447.

In concluding that Condition 10 of the Permit was intended to prohibit the Resort from watering its golf course with a public water resource suitable for drinking under county water quality standards, this court is following a long line of

_____

(. . . continued)

and future generations in the waters of the state," which "precludes any grant or assertion of vested rights to use water to the detriment of public trust purposes[]" and "empowers the state to reexamine any prior use." Kauai Springs, Inc., 133 Hawai'i at 172, 324 P.3d at 982 (citing Waiāhole I, 94 Hawai'i at 141, 9 P.3d at 453).

public trust doctrine rulings in which this court recognized rights and obligations protected under the Hawai'i Constitution. See King v. Oahu Ry. & Land Co., 11 Haw. 717, 725 (Haw. Terr. 1899) (holding that navigable waters are owned by the State in public trust); State by Kobayashi v. Zimring, 58 Haw. 106, 121, 566 P.2d 725, 735 (1977) (concluding that lava extensions are public land held in trust for the people of Hawai'i); Cty. of Hawaii v. Sotomura, 55 Haw. 176, 183-84, 517 P.2d 57, 63 (1973) (holding that land below the high water mark is a natural resource owned by the State); In re Sanborn, 57 Haw. 585, 593-94, 562 P.2d 771, 776 (1977) (stating that any purported land court registration of land below the high water mark is ineffective because such land is held in public trust); McBryde Sugar Co. v. Robinson, 54 Haw. 174, 186-87, 504 P.2d 1330, 1339 (1973) (holding that the right to water was specifically and definitely reserved for the people of Hawai'i); Waiāhole I, 94 Hawai'i at 132, 9 P.3d at 444 ("The state also bears an affirmative duty to take the public trust into account in the planning and allocation of water resources, and to protect public trust uses whenever feasible." (quotations and footnote omitted) (quoting Nat'l Audubon Soc'y v. Superior Ct., 658 P.2d 709, 728 (Cal. 1983))).  Such rulings were made without consideration of whether the landowners or impacted parties had notice of the existence of those rights prior to the court's

disposition.  See, e.g., Sotomura, 55 Haw. at 180, 517 P.2d at 61 ("We hold that registered ocean front property is subject to the same burdens and incidents as unregistered land[.]"  (citing HRS § 501-81)); Oahu Ry. & Land Co., 11 Haw. at 736 (observing that "it is doubtful if the State as a trustee for the public could consent to" private condemnation of the waters of Honolulu harbor); see generally Native Hawaiian Law: A Treatise, 76-148, 426-458 (Melody Kapilialoha MacKenzie ed. 2015) (discussing the historical and current development of public trust doctrine and water law in Hawai‘i).

In none of these cases did we suppose that the constitutional mandates of the public trust doctrine were inoperable or unrecognizable because the parties did not have express notice of the existence of the rights protected under the doctrine.  Instead, our cases indicate that State action with regard to trust resources is inherently limited by and subject to the State's public trust duties.  See Waiāhole I, 94 Hawai‘i at 131, 9 P.3d at 443 ("This court has held that the [public trust] doctrine would invalidate such measures, sanctioned by statute but violative of the public trust, as: the use of delegated eminent domain powers by a private party to condemn a public harbor; the land court's registration of tidelands below the high water mark; and a sale of lava extensions that did not promote a 'valid public purpose.'"

(citations omitted)); see also Oahu Ry. & Land Co., 11 Haw. at 725 (public harbor); In re Sanborn, 57 Haw. at 593-94, 562 P.2d at 776 (land court registration below high water mark); Zimring, 58 Haw. at 121, 566 P.2d at 735 (lava extensions).  As this court has unequivocally stated, "if the public trust is to retain any meaning and effect, it must recognize enduring public rights in trust resources separate from, and superior to, the prevailing private interests in the resources at any given time."  Waiāhole I, 94 Hawai'i at 138, 9 P.3d at 450.  The LUC's duty to protect and preserve Lāna'i's drinking water in trust for future generations therefore inherently limits the Resort from utilizing water in Wells 1 and 9 that is suitable for drinking under county water quality standards.  See id. at 131, 9 P.3d at 443; Kauai Springs, Inc., 133 Hawai'i at 172, 324 P.3d at 982 ("[T]he public trust protects domestic water use, in particular, protecting an adequate supply of drinking water.").

"[T]his court has repeatedly reaffirmed that the State's public trust obligations pursuant to article XI, section 1 of the Hawai'i Constitution extend 'to all water resources.'" Umberger v. Dep't of Land & Nat. Res., 140 Hawai'i 500, 521, 403 P.3d 277, 298 (2017) (quoting Waiāhole I, 94 Hawai'i at 133, 9 P.3d at 455); accord Kauai Springs, Inc., 133 Hawai'i at 172, 324 P.3d at 982 ("[T]he public trust doctrine applies to all water

31

resources without exception or distinction." (alteration in original)). The State thus has a constitutional obligation to protect water for all future generations. Kauai Springs, Inc., 133 Hawai'i at 172, 324 P.3d at 982 ("The public trust is, therefore, the duty and authority to maintain the purity and flow of our waters for future generations . . . ." (citing Waiāhole I, 94 Hawai'i at 138, 9 P.3d at 450)). Accordingly, "[a]n agency is not at liberty to abdicate its duty to uphold and enforce rights guaranteed by the Hawai'i Constitution when such rights are implicated by an agency action or decision." Mauna Kea Anaina Hou, 136 Hawai'i at 415, 363 P.3d at 263 (opinion of the court as to Part IV by Pollack, J.). The LUC therefore could not have waived its duty to ensure that water potable under county water quality standards from Wells 1 and 9 would not be permitted for golf course irrigation. Waiāhole I, 94 Hawai'i at 141, 9 P.3d at 453 ("The continuing authority of the state over its water resources precludes any grant or assertion of vested rights to use water to the detriment of public trust purposes."); Ching, 145 Hawai'i at 170, 449 P.3d at 1168 ("The most basic aspect of the State's trust duties is the obligation 'to protect and maintain the trust property and regulate its use.'"). Thus, the LUC has a continuing duty to evaluate the potability of the water in Wells 1 and 9 to ensure that the Resort does not violate Condition 10 by using water for

irrigation that is suitable for drinking under county water quality standards, regardless of the chloride level of the water.[14]

### C. The 1991 Hearing and Findings of Fact Do Not Indicate the 1991 LUC Considered Brackish Water To Be Per Se Non-potable.

The 1991 LUC's findings of fact are consistent with an interpretation of potability that is based on whether water meets the county's water quality standards for drinking water rather than whether water contains enough chlorides to qualify as "brackish."[15]  For instance, finding of fact 73 of the 1991 LUC Order stated that the "[g]roundwater underlying the proposed

---

[14]    The minority relies on this court's decision in DW Aina to contend that this opinion fails to give the Resort the "ascertainable certainty" required in an administrative order.  Minority Op. at 4-6 (citing DW Aina Leʻa Dev., LLC v. Bridge Aina Leʻa, LLC, 134 Hawaiʻi 187, 215-16, 339 P.3d 685, 713-14 (2014)).  The court in DW Aina was presented with a contractual dispute over whether the LUC had adequately defined the term "completed" as it related to affordable housing.  DW Aina Leʻa Dev., LLC, 134 Hawaiʻi at 215-16, 339 P.3d at 713-14.  Whether and when housing was "completed" in that case did not concern the State's public trust duties.  In pointed contrast, in this case, "potable" is imbedded with constitutional implications under the public trust doctrine that extend beyond a permit condition or administrative rule.  See Ching, 145 Hawaiʻi at 178, 449 P.3d at 1176 ("[T]he State's constitutional public trust obligations exist independent of any statutory mandate and must be fulfilled regardless of whether they coincide with any other legal duty."); In re Conservation Dist. Use Application HA-3568 (In re TMT), 143 Hawaiʻi 379, 415, 431 P.3d 752, 788 (2018) (Pollack, J., concurring) ("This court has indicated that an agency's public trust obligations may overlap with the agency's statutory duties, and it would follow that they may similarly overlap with duties imposed by an administrative rule.").
        The minority further asserts that county water quality standards fail to provide fair and predictable elements.  Minority Op. at 3-4.  As stated, county water quality standards are those standards that the county water agency would use in its domestic water system.

[15]    As noted, the term "brackish" is commonly defined as "somewhat salty, distasteful."  Lanai Co., 105 Hawaiʻi at 299 n.10, 97 P.3d at 375 n.10.

golf course at Manele is <u>too brackish for drinking water</u>." (Emphasis added.) By stating that some water is too brackish for domestic use, the LUC indicated that there is water that is brackish, but not so brackish as to render it non-potable under then-existing standards for domestic use. The 1991 LUC thus does not appear to have considered brackishness to be a binary, yes-or-no trait that necessarily makes water non-potable, but rather as one factor that is evaluated in determining potability.

But this does not mean that the LUC intended that the water in Wells 1 and 9 would always be considered non-potable regardless of surrounding circumstances, nor that the LUC intended that the designation would change only if the chloride levels were to drop below the threshold of 250 ppm. Indeed, there is no indication that the LUC contemplated the proposed 250 ppm threshold prior to imposing Condition 10, and it is therefore significantly more likely that it considered "non-potable" only in terms of county water quality standards rather than any specific numerical value. Accordingly, the circumstances in which the 1991 LUC Order was adopted also do not present any reason to depart from the plain meaning of its terms.

The minority and the Resort argue, however, that various references in the LUC's 1991 Findings of Fact and the

testimony and questions posed at the original LUC hearings suggest that the LUC viewed Wells 1 and 9 as permissible sources of non-potable water for irrigation.  Minority Op. at 13-17.  A court "must read the language of an administrative order in the context of the entire order."  Lanai Co., 105 Hawai'i at 310, 97 P.3d at 386 (emphasis added).  Instead, the minority rejects the common sense meaning of potable in favor of reliance on disparate references in the testimony of selected witnesses in a record exceeding 17,000 pages, including hundreds of pages of hearing transcripts, to determine the 1991 LUC's intent in imposing Condition 10.  See Minority Op. at 15-17.  Equally problematic is the minority's reliance on the phrasing of questions posed by counsel during the hearing to interpret the meaning of a term in Condition 10.  Minority Op. at 16.  The minority infers that because LSG's lawyer, in referencing a witness's prior response during cross-examination, asked about "a nonpotable or brackish water source" for the golf course, the lawyer believed brackish was synonymous with non-potable.  Minority Op. at 16.  The manner in which the question was posed to the witness does not mean that the lawyer considered brackish water and non-potable water to be the same; instead, it highlights the analytical flaws of extrapolating from an

interpretation of a lawyer's question to determine the meaning of a term in the 1991 LUC Order.[16]

It is plainly contrary to principles of statutory construction in interpreting an administrative order to rely on selected witness testimony and the phrasing of attorney questions. See Guyton, 135 Hawaiʻi at 378, 351 P.3d at 1144. Instead, the plain meaning of the term "potable," as made clear by the entirety of the 1991 LUC Order, must prevail.

The language of Condition 10 and the circumstances in which it was adopted indicate that the 1991 LUC did not intend that all brackish water would be considered inherently non-potable. By the 2017 LUC's own admission, such a holding would require this court to interpret the terms "potable" and "non-potable" in a manner that is contrary to their "common sense" meanings. We reject an interpretation of a term that is contrary to its common sense meaning, especially in the absence of far stronger indications that this is what was intended. Further, such an interpretation would be contrary to public

---

[16] Additionally, some of the testimony cited by the minority appears to implicitly acknowledge that potability is an evolving concept that may change with time. Minority Op. at 16. For example, James Kumagai, the Resort's expert witness on civil, sanitary, and environmental engineering, testified that "Well 9 has proved to have higher chlorides than what we had anticipated . . . . It's brackish and we consider that right now nonpotable, but suitable for landscape irrigation." (Emphasis added.) If potability was a static concept based only on whether chloride levels exceed a specific threshold, there would be no reason for Kumagai to clarify that, as of that moment, the Resort considered the brackish water in Well 9 to be non-potable.

trust principles with which the LUC is presumed to have complied. The 1991 LUC fulfilled its constitutional public trust duties with respect to Condition 10 by crafting a standard that turns on county water quality standards for drinking water as they develop.

**D. A Proper Interpretation of Condition 10 Permits a Correct Analysis of the Effects of Leakage from the High Level Aquifer.**

In Lanai Co., this court noted that the LUC had not determined whether the Resort's actions were the cause of potable water leaking into Wells 1 and 9, and assuming that they were, the LUC had not indicated whether the effect of such actions would mean that potable water was being utilized under Condition 10:

> LUC makes no specific finding or conclusion as to whether [the Resort] was using potable water. Additionally, it is not clear from finding No. 30, whether the potable water leaking into Wells No. 1 and 9 is a direct result of [the Resort's] actions, or if such leakage would occur irrespective of [the Resort's] water usage. Similarly, assuming [the Resort's] use is affecting potable water in the high level aquifer, the LUC did not indicate whether such an effect would qualify as "utiliz[ing] the potable water" under Condition No. 10.

Lanai Co., 105 Hawaiʻi at 316, 97 P.3d at 392 (emphases added) (alteration in original). On remand, the 2017 LUC found that the record was inconclusive as to the degree to which the pumping of water from Wells 1 and 9 may cause the leakage of water from other areas of the high level aquifer that are currently used for potable drinking water. It further found that there was no indication that any leakage has harmed

37

existing or planned uses of water for domestic purposes. Finally, the 2017 LUC concluded that the leakage "theory" is inconsistent with the language of Condition 10 "in which brackish water was described as non-potable, and in which brackish water from Wells 1 and 9 [was] proposed for irrigation of the Mānele Golf Course."

Properly interpreting Condition 10 to prohibit the Resort from utilizing water that meets county water quality standards for domestic use resolves the issue of leakage. Leakage would result in a violation of Condition 10 if the commingling of freshwater with brackish water changes the composition of the water in Wells 1 and 9 such that it becomes suitable for domestic use under county water standards and the Resort thereafter uses the water for irrigation. However, the 2017 LUC's interpretation would permit utilization of the water in Wells 1 or 9 regardless of whether leakage from the high level aquifer renders the water suitable for domestic use under county water quality standards, further evincing the flawed nature of such an interpretation.

In addressing the issue of freshwater leakage, the minority concludes that the 2017 LUC did not err in holding that, "By drawing only from brackish Wells 1 and 9 in the high-level aquifer, the Resort did not 'utilize' any other sources per Condition 10." Minority Op. at 17. As stated, under the

38

2017 LUC interpretation, regardless of whether the Resort's pumping of water from Wells 1 and 9 causes leakage of potable water from the high level aquifer into those wells, such leakage does not constitute "utilization" of potable water from the high level aquifer so as to violate Condition 10.  This is because the 2017 LUC would find that the commingling of freshwater with brackish water renders such mixed water in Wells 1 and 9 as non-potable and thus usable for golf course irrigation.  This flawed proposition highlights the illogical and non-common sense interpretation that the 2017 LUC applies to Condition 10 in equating non-potable water with brackish water.[17]

### E. The 2017 LUC Did Not Clearly Err in Concluding That the Water in Wells 1 and 9 Was Non-potable Under County Water Quality Standards.

The 2017 LUC found that the water from Wells 1 and 9 would not currently be accepted as potable by the County of Maui

---

[17]    Indeed, the analysis applied by the 2017 LUC would allow the Resort to pump water from Wells 1 and 9 with the full knowledge that potable water was leaking from the high level aquifer as a result of its pumpage. But even assuming that the Resort was unaware that its actions were causing leakage, the language of Condition 10 makes no distinction as to whether the Resort's utilization of potable water is intentional or not; it is not permitted.  The minority would require "conclusive evidence of leakage, and that leakage caused the designation of Wells 1 and 9 to change from 'brackish' to 'potable'" in order to prove that the Resort was utilizing water from a potable well.  Minority Op. at 17 n.4 (emphasis added).  Such a reading clearly violates the public trust doctrine.  If there is evidence of potable water leaking from the high level aquifer into Wells 1 and 9, the Resort will be in violation of Condition 10, regardless of whether the water in Wells 1 and 9 remain non-potable.  See Kauai Springs, Inc., 133 Hawaiʻi at 174, 324 P.3d at 984.  Alternatively, the minority would require conclusive evidence that the water utilized by the Resort "originated in the potable wells."  Minority Op. at 17 n.4.  It is unclear how the source of commingled water can be shown by "conclusive evidence."

because of its chloride levels, and it cannot be said that this finding was clearly erroneous given the evidence in the record. The 2017 LUC therefore did not err in determining that the Resort was in compliance with Condition 10. However, the State has a continuing public trust duty to ensure the Resort's compliance with Condition 10 by evaluative monitoring of the quality of water that the Resort uses for irrigation in relation to the county water quality standards for drinking water. Condition 10 would be violated if the Resort were to use water for irrigation that was considered suitable for drinking under county water quality standards, regardless of the chloride level of the water.

The contention in Justice Wilson's opinion, dissenting as to Parts III(E) and IV, that the record does not establish whether the water in Wells 1 and 9 contained potable water under county water quality standards during the relevant time period is unpersuasive. Wilson, J., Dissenting as to Parts III(E) and IV at 21-23. The 2017 LUC found, and the record does not indicate otherwise, that the County of Maui would not have accepted the water in Wells 1 and 9 as potable. That finding is not clearly erroneous, and the Resort accordingly did not violate Condition 10 of the LUC's administrative order.

## IV.   CONCLUSION

For the foregoing reasons, the 2017 LUC Order is affirmed to the extent that it is consistent with this opinion.



Alan T. Murakami
(Moses K.N. Haia, III, with him
on the briefs)
for appellant Lānaʻians for
Sensible Growth

Bryan C. Yee
(Dawn Takeuchi-Apuna with him on
the brief)
for appellee State Office of
Planning

Benjamin A. Kudo
(James K. Mee and Sarah M.
Simmons with him on the brief)
for appellee Lānaʻi Resorts, LLC

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

I join in Parts I—III(A)-(D) of
this opinion.

/s/ Michael D. Wilson