*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

**Electronically Filed
Supreme Court
SCOT-21-0000041
02-MAR-2022
02:35 PM
Dkt. 195 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

In the Matter of the Application of

MAUI ELECTRIC COMPANY, LIMITED

For Approval of Power Purchase Agreement for Renewable Dispatchable Generation with Paeahu Solar LLC.

SCOT-21-0000041

APPEAL FROM THE PUBLIC UTILITIES COMMISSION
(Agency Docket No. 2018-0433)

MARCH 2, 2022

RECKTENWALD, C.J., NAKAYAMA, McKENNA, AND EDDINS, JJ.;
AND WILSON, J., DISSENTING

OPINION OF THE COURT BY EDDINS, J.

After a contested case proceeding, the Public Utilities

Commission (PUC) approved a power purchase agreement (PPA)

between Maui Electric Company, Limited (MECO) and Paeahu Solar

LLC (Paeahu).

The PPA followed competitive bidding that MECO and other electric utility companies collectively conducted in 2018. Paeahu was one of eight projects selected through this competitive procurement process. Under the PPA, MECO would purchase renewable energy from Paeahu's solar-plus-battery plant located within Ulupalakua Ranch on Maui (the Project).

Appellant Pono Power Coalition (Pono Power), a Maui community group, asks this court to vacate the PUC's approval of the PPA for two reasons.[1]

First, Pono Power points to the winning bidders' post-selection use of the same counsel to negotiate non-price PPA terms. It argues the PUC failed to evaluate the common counsel's involvement under the "rule of reason," a burden-shifting standard created for Sherman Antitrust Act cases.

Second, Pono Power asserts that the PUC failed to fulfill its public trust duties. It claims the PUC merely catalogued the Project's anticipated permits and left decision-making about trust resources to the agencies with jurisdiction over those permits. Instead, Pono Power contends, the PUC should have made

---

[1] As a third point of error, Pono Power contests the PUC's conclusion that Paeahu satisfied its community outreach obligations. This argument lacks merit. The PUC reviewed evidence about Paeahu's community engagement activities. And it credited Paeahu's responses to community concerns; Paeahu made design changes and explored an alternative location. The PUC then found that Paeahu fulfilled its community outreach requirements. We do not find clear error in the PUC's findings.

explicit findings that identified the affected trust resources and how they would be protected.

We reject both arguments.

We decline to inject antitrust standards into PPA approval proceedings. Hawai'i Revised Statutes (HRS)[2] chapter 269 already requires the PUC to examine potential anticompetitive practices. And those statutes equip the PUC with a framework for that analysis: they prescribe "the public interest" as the controlling principle.

We hold that the PUC appropriately evaluated the allegations of anticompetitive conduct. The PUC considered the circumstances relating to the winning bidders' shared counsel, balanced other statutory factors, and found the PPA terms reasonable and in the public interest. The PUC was not required to apply antitrust standards in this analysis.

Next, we hold that the statutes governing the PUC's PPA review – HRS §§ 269-6(b) and 269-145.5(b) - reflect the core public trust principles: the State and its agencies must *protect* and promote the *justified use* of Hawai'i's natural beauty and natural resources. Thus, when there is no reasonable threat to a trust resource, satisfying those statutory provisions fulfills the PUC's obligations as trustee. But when a project poses a

---

[2]    All references to HRS provisions reflect their latest published version as of the PUC's Decision and Order 37340 approving the PPA.

reasonable threat, the public trust principles require more from the PUC: the commission must assess that threat and make specific findings about the affected trust resource.

Here, the record shows that the PUC conducted the statutory balancing. Under HRS § 269-6(b), the PUC considered the need to mitigate the risks associated with fossil fuel-based energy; it also weighed other "technical, economic, environmental, and cultural considerations" under HRS § 269-145.5(b). The PUC then found the PPA "in the public interest." Because the record lacks a reasonable threat to a trust resource, this public interest-minded balancing satisfied the PUC's public trust duties.

We affirm the PUC's approval of the PPA.

**I.**

The Hawaiʻi legislature has committed to protect the climate and mitigate climate change by reducing reliance on fossil fuels and converting to renewable energy sources.

In 2015, the legislature took a decisive step: it set a goal to reach 100% renewable energy by 2045. 2015 Haw. Sess. Laws Act 97, § 2 at 245-46; HRS § 269-92(a)(6).

To meet this target, the Hawaiian Electric Companies – MECO, Hawaiian Electric Company, Inc., and Hawaii Electric Light Company, Inc. – developed a plan to competitively procure grid-

4

scale renewable power supplies.  The PUC accepted this plan in 2017.

The first phase of competitive bidding began in early 2018. The Hawaiian Electric Companies issued requests for proposals (RFPs) for O'ahu, Maui, and Hawai'i Island.  The RFPs reflected comments from interested stakeholders.  They also incorporated guidance from the PUC and PUC-appointed Independent Observers.

The Hawaiian Electric Companies conducted multi-step bid evaluations.  The bidders' pricing terms were set during this process.  The utility companies ultimately selected eight projects: four on O'ahu, two on Maui, and two on Hawai'i Island.[3] Paeahu was one of the Maui projects.

The Hawaiian Electric Companies negotiated PPAs for the winning projects.  Only non-price terms were discussed since the projects' prices had already been fixed.  During this PPA negotiation phase, one law firm represented the developers for the selected projects (the Finalists).

MECO and Paeahu agreed on the PPA terms.  The Independent Observer overseeing MECO's RFP process (the IO) concluded that MECO conducted bid evaluations and PPA negotiations on a "fair and consistent basis."

---

[3]     Four developers submitted these eight projects.

MECO submitted the PPA for the PUC's approval.[4]  Besides MECO, the Division of Consumer Advocacy (Consumer Advocate or CA) became a party to the PPA approval proceeding.[5]

Pono Power then moved to intervene or participate in the PPA approval proceeding.  Recognizing Pono Power members' right to a clean and healthful environment, the PUC granted Pono Power participant status.  After considering Paeahu's motion, the PUC also made it a participant.

The PUC held a two-day evidentiary hearing in December 2019.  Witnesses testified and were cross-examined; they discussed the RFP process, PPA negotiations, pricing, greenhouse gas (GHG) analysis, community outreach, and Paeahu's studies relating to the Project's impact on cultural and natural resources.  Both before and after the hearing, the parties and participants submitted and responded to information requests related to these issues.

In October 2020, the PUC approved the PPA.  It issued Decision and Order No. 37340 (the Approval Order).  After

---

[4]     MECO asked the PUC to review its requests in two stages: (1) addressing its PPA-related requests (including the recovery of costs associated with the PPA) first and (2) considering its request to construct an above-ground line extension later.  The PUC granted the request.  This appeal concerns the first stage.

[5]     The CA participated as an *ex officio* party per HRS § 269-51 and Hawai'i Administrative Rules (HAR) § 16-601-62(a).  HRS § 269-51(a) requires the CA to "represent, protect, and advance the interests of all consumers . . . of utility services."

investigating concerns about the Finalists' common counsel and weighing environmental and other statutory considerations, the PUC found the PPA "in the public interest."

Pono Power moved for reconsideration of the approval. The PUC denied that motion in Order No. 37553 (the Recon Order).

Pono Power appeals both the Approval and Recon Orders. It asks this court to vacate the PPA approval, alleging two primary deficiencies in the PUC's findings: (1) the PUC did not apply the rule of reason to evaluate the Finalists' post-selection choice of counsel; and (2) the PUC did not make affirmative findings about trust resources affected by the Project.

Both arguments fail.

## II.

Pono Power's first argument targets the Finalists' use of the same counsel to negotiate non-price PPA terms. Pono Power invokes the Sherman Act. It contends the PUC failed to apply the "rule of reason" - a burden-shifting standard for assessing antitrust claims - to evaluate anticompetitive concerns surrounding the Finalists' common counsel.

The rule of reason involves "a fact-specific assessment of market power and market structure . . . to assess the [challenged conduct's] actual effect on competition." Ohio v. Am. Express Co., __ U.S. __, 138 S. Ct. 2274, 2284 (2018)

7

(emphasis added) (citation and internal quotation marks omitted).

Under this rule, the plaintiff has the initial burden to show the challenged activity's "substantial anticompetitive effect." NCAA v. Alston, __ U.S. __, 141 S. Ct. 2141, 2160 (2021) (citation omitted). If the plaintiff does this, the burden shifts to the defendant to show a "procompetitive rationale" for the activity.[6] Id. (citation omitted).

Pono Power says it produced evidence showing "how bidders' collusion . . . harmed competition." It highlights two facts to support this accusation: (1) after the bid selection, all Finalists hired the same legal counsel to negotiate non-price PPA terms; and (2) some of those terms were similar or identical across the projects. So, Pono Power claims, the PUC should have shifted the burden to the PPA proponents and required them to prove that the sharing of counsel was "not a restraint of trade." The PUC did not engage in this burden shifting. This failure to apply the rule of reason, Pono Power argues, was reversible error.[7]

---

[6] If the defendant satisfies this second step, the plaintiff must then show "less anticompetitive means" to achieve the "procompetitive efficiencies." Alston, __ U.S. at __, 141 S. Ct. at 2160 (citation omitted).

[7] Pono Power also invokes the Sherman Act's "per se" and "quick look" standards. Courts use these analytical shortcuts in limited circumstances where the challenged activities' anticompetitive effects are immediately apparent. See Alston, __ U.S. at __, 141 S. Ct. at 2156 ("[S]ome agreements among competitors so obviously threaten to reduce output and raise prices that they might be condemned as unlawful *per se* or rejected after only a

We reject Pono Power's attempt to inject antitrust standards into PPA approval proceedings.

First, Pono Power cites no authority for that position.  It fails to provide, and we have not found, any cases that applied antitrust standards in public utility PPA approval proceedings.

Second, the PUC has no power to adjudicate alleged violations of federal or state antitrust laws.  The PUC is not the right forum to litigate antitrust claims; courts are.  See 15 U.S.C. § 4 (granting jurisdiction to "prevent and restrain" violations of the Sherman Act (§§ 1-7) to federal district courts); HRS § 480-21 (designating appropriate courts where actions or proceedings authorized by HRS chapter 480's antitrust statutes are to be initiated).

Third, the PUC's governing laws already require the commission to assess allegations of collusion or anticompetitive practices; they also provide the framework for that assessment.

The PUC must always act in the public interest.  This principle is incorporated throughout HRS chapter 269.  See,

---

quick look.").  Pono Power fails to meaningfully explain why these tests are applicable here.

Further, in its *reply* briefs, Pono Power raises new arguments alleging violations of HRS § 480-2 (prohibiting unfair or deceptive trade practices) and HRS § 480-4 (forbidding restraints of trade).  Pono Power waived these arguments.  See Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4) (requiring "[a] concise statement of the points of error" in opening briefs); HRAP Rule 28(b)(7)("Points not argued [in opening briefs] may be deemed waived.").

e.g., HRS § 269-16.22 (disallowing a utility's recovery of power purchase costs if the PUC finds them to have been incurred "in bad faith" or "in violation of law"); HRS § 269-27.2(c) (providing the PUC authority to determine as appropriate "the just and reasonable rate" for non-fossil fuel-generated electricity supplied to a utility company); HRS § 269-145.5(b) ("In advancing the public interest, the commission shall balance technical, economic, environmental, and cultural considerations associated with modernization of the electric grid . . . .").

This "public interest" analysis will be incomplete unless the PUC examines potentially anticompetitive conduct. Cf. Cent. Iowa Power Coop. v. FERC, 606 F.2d 1156, 1162 (D.C. Cir. 1979) ("Although the [Federal Power Commission] lacks authority to adjudicate violations of the antitrust laws, it must consider competitive factors when acting under the public interest mandate of the [Federal Power Act]."). The PUC's 2006 adoption of the Framework for Competitive Bidding reflects this view; this framework generally requires electric utilities to use a *competitive* bidding process to acquire "a future generation resource or block of generation resources."

Thus, when anticompetitive concerns arise, the PUC must assess them within the statutory "public interest" analysis. But the PUC is not required to use antitrust standards to do that.

10

A question remains: did the PUC properly discharge its duty to assess potential anticompetitive issues in approving the PPA? It did.

The PUC did not dodge the concerns about the Finalists' shared counsel. It investigated; it made specific findings. The Approval Order reflects that the PUC considered the vetting mechanisms built into the procurement process; they included the IO's oversight throughout the bidding and PPA negotiation phases. The PUC then concluded it had sufficient assurance that the PPA was negotiated "in good faith and without collusion." It determined that Paeahu's choice of counsel did not have "any adverse impact on the pricing and terms of the PPA." The PUC in the end found the PPA terms "prudent and in the public interest."

The record supports the PUC's findings. The Independent Observer and the State Consumer Advocate found no evidence of collusion. As the IO reported to the PUC, the RFP and PPA negotiation processes were "performed on a fair and consistent basis."

Further, the IO and the CA did not find any adverse impact caused by the Finalists' post-selection sharing of counsel. The IO concluded the negotiated PPA terms were "not unfair" to losing bidders; it also determined that those terms "[did] not materially alter the risk balance" between MECO and Paeahu as

11

originally contemplated.  The CA similarly did not believe the Finalists' sharing of counsel resulted in direct harm to customers.[8]

Pono Power does not question the IO and the CA's neutrality or credibility.  It instead raises cryptic concerns about the common counsel's involvement in the PPA negotiations.  Pono Power claims that shared representation was "a red flag" and "inherently suspect."  Beyond that, it points to some similarities in the negotiated terms across the Finalists' PPAs.  Yet, Pono Power doesn't identify the problematic terms.  It provides no concrete explanation as to how any PPA term reflects collusion, anticompetitive injury, or harm to ratepayers in general.[9]  Pono Power's own antitrust expert belies its claim of anticompetitive harm; the expert testified that shared representation and contract standardization can have pro-competitive benefits.  Pono Power's vague, conclusory allegations do not undermine the PUC's contrary findings.

---

[8]     The PUC also relied on the nondisclosure agreements (NDAs) signed by the Finalists.  As Pono Power's antitrust expert acknowledged, NDAs are "certainly a step in the right direction."  But we share Pono Power's concern about NDAs' effectiveness in preventing improper information sharing or collusion through common counsel.  This concern, however, is mitigated by the PUC's duty to examine potentially anticompetitive actions.

[9]     Pono Power also relies on the PPA's unit price (which is slightly higher than the other selected projects' prices) as evidence of adverse impact flowing from the Finalists' use of the same counsel.  This claim astounds.  The Project's price was a done deal *before* the alleged collusion happened; Pono Power should know it cannot be the basis for proving the challenged conduct's anticompetitive harm.

Besides the anticompetitive issue, the PUC considered the undisputed evidence that the Project would reduce GHG emissions, mitigate risks associated with fossil fuel, and contribute to the State's 100% renewable energy goal.  After examining these factors, the Project's price, and other statutory considerations, see infra section III.B., the PUC found the PPA "in the public interest."

We do not find clear error in these findings.

### III.

Pono Power next invokes Hawaiʻi's public trust doctrine expressed in article XI, section 1 of our constitution.[10]

Pono Power maintains the PUC should have made explicit findings identifying the affected trust resources and assessing how they would be protected.  Instead, Pono Power asserts, the PUC abandoned its trust responsibilities by concluding that other permitting agencies would review Paeahu's studies relating to cultural and natural resources before they approve or deny the requested permits.

---

[10]     Article XI, section 1 of the Hawaiʻi Constitution reads:

> For the benefit of present and future generations, the
> State and its political subdivisions shall conserve and
> protect Hawaii's natural beauty and all natural resources,
> including land, water, air, minerals and energy sources,
> and shall promote the development and utilization of these
> resources in a manner consistent with their conservation
> and in furtherance of the self-sufficiency of the State.
>
> All public natural resources are held in trust by the State
> for the benefit of the people.

13

The PUC and the PPA proponents believe that the PUC fulfilled its trustee duties by carrying out its statutory mandates; namely, to consider fossil fuel-related harms under HRS § 269-6(b)[11] and to balance "technical, economic, environmental and cultural" factors in advancing the public interest under HRS § 269-145.5(b).[12]

The PUC has public trust obligations. See In re Gas Co., 147 Hawaiʻi 186, 207, 465 P.3d 633, 654 (2020) (directing the PUC

---

[11]   HRS § 269-6(b) requires the PUC to weigh several fossil fuel-related factors:

> (b) The public utilities commission shall consider the need to reduce the State's reliance on fossil fuels through energy efficiency and increased renewable energy generation in exercising its authority and duties under this chapter. In making determinations of the reasonableness of the costs of utility system capital improvements and operations, the commission shall explicitly consider, quantitatively or qualitatively, the effect of the State's reliance on fossil fuels on price volatility, export of funds for fuel imports, fuel supply reliability risk, and greenhouse gas emissions. . . .

(Emphases added.)

[12]   HRS § 269-145.5(b) commands:

> (b) In advancing the public interest, the commission shall balance technical, economic, environmental, and cultural considerations associated with modernization of the electric grid, based on principles that include but are not limited to:
>
>> (1) Enabling a diverse portfolio of renewable energy resources;
>>
>> (2) Expanding options for customers to manage their energy use;
>>
>> (3) Maximizing interconnection of distributed generation to the State's electric grids on a cost-effective basis at non-discriminatory terms and at just and reasonable rates, while maintaining the reliability of the State's electric grids, and allowing such access and rates through applicable

14

to consider its constitutional trust obligations on remand). Though we signaled in In re Gas Co. that the PUC must hew to public trust principles, we have not explored the dimensions of its trustee duties.

Pono Power's second argument asks us to determine what public trust duties are occasioned by the PUC's PPA approval process. We first examine the contours of those duties. We then consider whether the PUC's approval of the PPA complied with those constitutional obligations. We hold it did.

**A.**

The Hawai'i Constitution offers vast and versatile public trust protections. Article XI, section 1 of our constitution declares: "[a]ll public natural resources are held in trust by the State for the benefit of the people." Haw. Const. art. XI, § 1. Article XI, section 1 protections apply to present and future generations. Id. "[T]he State and its political subdivisions" must "conserve and protect Hawaii's natural beauty

rules, orders, and tariffs as reviewed and approved by the commission;

(4) Determining fair compensation for electric grid services and other benefits provided to customers and for electric grid services and other benefits provided by distributed generation customers and other non-utility service providers; and

(5) Maintaining or enhancing grid reliability and safety through modernization of the State's electric grids.

(Emphasis added.)

15

and natural resources." Id. (emphasis added). In parallel, the State and its agencies must "promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of the self-sufficiency of the State." Id. (emphasis added).

In essence, article XI, section 1 directs the State and its agencies to assess and balance "protection" and "utilization" of public trust resources. In re Conservation Dist. Use Application (CDUA) HA-3568, 143 Hawai'i 379, 400, 431 P.3d 752, 773 (2018) (Mauna Kea II).

Beyond these core principles, the public trust doctrine's dimensions adapt to the circumstances. See Lāna'ians for Sensible Growth v. Land Use Comm'n, 146 Hawai'i 496, 507, 463 P.3d 1153, 1164 (2020) ("The public trust, by its very nature, does not remain fixed for all time, but must conform to changing needs and circumstances." (Citation omitted.)); Mauna Kea II, 143 Hawai'i at 401 n.24, 431 P.3d at 774 n.24 (declining to "wholesale adopt" our water trust precedent in the land trust context because different constitutional and statutory provisions may "play a part" in defining the trust principles governing the land at issue).

Here, the PUC's PPA review implicates unique policy goals and practical considerations.

16

The PUC's regulatory mission is broad. The PUC must ensure the reliability of Hawaiʻi's electric system. HRS chapter 269, Part IX. It must also safeguard energy affordability; all rates charged by electric utilities must be "just and reasonable." HRS § 269-16(a). Alongside these technical and economic duties, the PUC must consider the State's dependence on fossil fuels and the fast-approaching 100% renewable energy goal. HRS §§ 269-6, 269-92. These considerations are intended to mitigate the unhealthy effects of climate change. See infra n.15.

Given the PUC's distinctive mission to fortify the State's power system while focusing on climate change mitigation, we decline to superimpose the water or land trust jurisprudence into the PPA approval context.

Rather, the core public trust principles articulated in article XI, section 1 should guide the PUC: it must assess and balance "protect[ion]" and "utilization" of public trust resources when it reviews a PPA. Haw. Const. art. XI, § 1.

This duty heightens when the proposed project poses a *reasonable* threat to a trust resource. In that situation, the PUC as a trustee must further assess that threat; and to approve the project's PPA, it must affirmatively find that there is no harm to the trust resource or that potential harm is justified. See Kauai Springs, Inc. v. Planning Comm'n of Kauaʻi, 133 Hawaiʻi 141, 173, 324 P.3d 951, 983 (2014) ("If there is a reasonable

17

allegation of harm to one of the uses protected by the public trust, then the [permit] applicant must demonstrate that there is no harm in fact or that any potential harm does not preclude a finding that the requested use is nevertheless reasonable and beneficial." (Emphases added.)); cf. Ching v. Case, 145 Hawai'i 148, 177, 449 P.3d 1146, 1175 (2019) (recognizing "a duty to investigate upon being made aware of evidence of possible damage" to trust property as "a necessary component of [a trustee's] general duty").[13]

A "reasonable" threat does not mean that there must be conclusive evidence of harm. But it means something more than vague and tenuous concerns about a project's surrounding environment; there must be tangible evidence that reasonably connects the threatened harm to the proposed project.

**B.**

We now examine whether the PUC satisfied its public trust obligations.

---

[13] The dissent relies on Ching to assert that the PUC must independently investigate evidence of "possible" damage to specific public trust resources when it reviews a PPA. We are unpersuaded by this argument. Ching recognized an agency's duty to investigate potential harm in the context of examining that agency's *continuing duty* to monitor the relevant trust property *after* it authorized the use of that property. Ching, 145 Hawai'i at 152, 176-78, 449 P.3d at 1150, 1174-76. In such "monitoring" situations, where a party has permission to use trust resources and may even already be using them, the risk of "impending damage" is concrete. Id. at 152, 449 P.3d at 1150. Evidence of "possible" harm can quickly turn into real, irreparable damage. But in the PPA review context, the range of "possible" harm is more open-ended; to require the PUC to pursue every hint of "possible" harm would cause goose chases that we cannot endorse. We conclude Kauai Spring's "reasonable[ness]" standard is more appropriate here.

18

We hold that the PUC's PPA review aligned with its public trust duties.  The PUC balanced various statutory factors to support its "public interest" findings.  Because the record lacks credible evidence that the Project posed a reasonable threat to a trust resource, the PUC's weighing of environmental and other public interest factors within its statutory framework satisfied its trustee obligations.

An agency's constitutional public trust obligations are independent of its statutory mandates.  Kauai Springs, 133 Hawai'i at 172, 324 P.3d at 982.

But they operate in tandem.  An agency "must perform its statutory function in a manner that fulfills the State's affirmative constitutional obligations."  Lāna'ians for Sensible Growth, 146 Hawai'i at 506, 463 P.3d at 1163 (citation omitted).  At the same time, an agency's governing statutes and regulatory provisions provide "the context for applying the broad principles of the public trust doctrine to the specific task faced by the agency."  Kauai Springs, 133 Hawai'i at 184, 324 P.3d at 994 (Recktenwald, C.J., concurring and dissenting).  That is because an agency "can only wield powers expressly or implicitly granted to it by statute."  Morgan v. Planning Dep't, Cnty. of Kauai, 104 Hawai'i 173, 184, 86 P.3d 982, 993 (2004) (citation omitted).

An agency's public trust and statutory mandates can be co-extensive.  See In re Water Use Permit Applications, 94 Hawaiʻi 97, 145, 9 P.3d 409, 457 (2000) (acknowledging that the State Water Code's policy provisions "mirror[] the public trust principles").  They were here.

In approving the PPA, the PUC followed HRS §§ 269-6 and 269-145.5.

Under HRS § 269-6(b), the PUC must consider "the need to reduce the State's reliance on fossil fuels through energy efficiency and increased renewable energy generation."  It must explicitly assess "the effect of the State's reliance on fossil fuels on price volatility, export of funds for fuel imports, fuel supply reliability risk, and greenhouse gas emissions."  HRS § 269-6(b) (emphasis added).

A primary purpose of this provision is to combat "air pollution" and "potentially harmful climate change" stemming from "the release of harmful greenhouse gases."  In re Maui Elec. Co., 141 Hawaiʻi 249, 263, 408 P.3d 1, 15 (2017) (In re MECO) (emphases added) (quoting H. Stand. Comm. Rep. No. 1004, in 2011 House Journal, at 1332).

So public trust considerations – namely, those related to protection of air and other trust resources affected by climate change – are built into HRS § 269-6(b).

Further, under HRS § 269-145.5(a), the PUC must consider

20

the value of improving the State's electrical system by using "advanced grid modernization technology."  HRS § 269-145.5(b) provides further guidance: "In advancing the public interest, the commission shall balance <u>technical, economic, environmental, and cultural considerations</u> associated with modernization of the electric grid . . . ."  (Emphasis added.)  These "environmental" and "cultural" considerations implicate public trust resources.  The PUC must balance those considerations against other technical and economic factors to promote "the public interest."[14]

We hold that the "public interest"-minded balancing requirement under HRS §§ 269-6(b) and 269-145.5(b) aligns with the core public trust principles weighing protection and utilization.[15]

---

[14]     HRS § 269-145.5(b) provides five principles that the PUC should use when conducting this public interest balancing.  They include "[e]nabling a diverse portfolio of renewable energy resources."  HRS § 269-145.5(b)(1).  This subsection complements HRS § 269-6(b)'s focus on moving away from fossil fuel-generated power and curbing climate change, while requiring the PUC to assess other statutory factors.

[15]     HRS chapter 269 also intersects with article XI, section 9 of the Hawaiʻi Constitution.  In Hawaiʻi, a person enjoys a substantive right to "a clean and healthful environment."  Haw. Const. art. XI, § 9; <u>In re MECO</u>, 141 Hawaiʻi at 260-61, 408 P.3d at 12-13.  Though this right is constitutionally vested, its parameters are defined by "laws relating to environmental quality."  Haw. Const. art. XI, § 9.  "HRS Chapter 269 is a law relating to environmental quality that defines the right to a clean and healthful environment."  <u>In re MECO</u>, 141 Hawaiʻi at 264, 408 P.3d at 16.  Recognizing Pono Power members' right to a clean and healthful environment, the PUC granted Pono Power participant status.

Article XI, section 9's "clean and healthful environment" right as defined by HRS chapter 269 subsumes a right to a life-sustaining climate system.  The need to mitigate the catastrophic effects of anthropogenic

climate change underlies HRS chapter 269; it in turn shapes and defines the right to a clean and healthful environment.

HRS chapter 269 imposes an obligation on the PUC to consider fossil fuel-related harms and promote climate change mitigation. HRS § 269-6(b) reflects this overarching mission. This statute applies to "all of the [PUC's] duties"; it requires the commission "to reduce reliance on fossil fuels and to consider [GHG] emissions." In re MECO, 141 Hawai'i at 263, 408 P.3d at 15. The legislative history reveals an intent to require the PUC to consider "the hidden and long-term costs of reliance on fossil fuels." Id. The legislature believed those costs included "potentially harmful climate change due to the release of harmful [GHG]." Id. (quoting H. Stand. Comm. Rep. No. 1004, in 2011 House Journal, at 1332). Besides HRS § 269-6(b), HRS chapter 269 contains additional provisions reflecting the legislature's concerns about climate change and the resulting push toward renewable energy. See, e.g., HRS § 269-27.2 (providing guidance on utilization of non-fossil fuel-generated power supply); HRS § 269-92(a) (imposing renewable portfolio standards).

In 2020, the Hawai'i legislature passed a law preventing the PUC from approving any new or renewed coal power-based PPAs. 2020 Haw. Sess. Law Act 23, § 2 at 287; HRS § 269-48. The legislature recognized that coal-powered electricity poses a "clear threat . . . to health and the climate." 2020 Haw. Sess. Law Act 23, § 1 at 287. It referenced the United Nations Intergovernmental Panel on Climate Change's (IPCC) 2018 "Special Report on 1.5 Degrees Celsius." Id. The legislature explained the special report found that limiting global warming to 1.5 degrees Celsius to "avoid devastating climate change" would mean "a complete phase-out" of coal-generated electricity. Id. (emphasis added).

There is scientific consensus: anthropogenic global warming threatens the world's climate system. It raises the seas; it sickens the planet. It harms present and future generations. See generally Summary for Policymakers in Climate Change 2021: The Physical Science Basis, IPCC (Valérie Masson-Delmotte et al. eds., 2021), https://www.ipcc.ch/report/ar6/wg1/downloads/report/IPCC_AR6_WGI_SPM_final.pdf [https://perma.cc/U6KB-ZAAD] (summarizing the key findings of the IPCC's sixth assessment report on "the physical science basis of climate change" (which builds upon the IPCC's previous assessment report and special reports) and discussing the current state of the climate system and possible climate change scenarios); Summary for Policymakers in Climate Change 2022: Impacts, Adaptation and Vulnerability at SPM-7-8, IPCC (Hans-O Pörtner et al., 2022), https://report.ipcc.ch/ar6wg2/pdf/IPCC_AR6_WGII_SummaryForPolicymakers.pdf [https://perma.cc/FM6K-H7KH] ("The rise in weather and climate extremes has led to some irreversible impacts as natural and human systems are pushed beyond their ability to adapt.").

Hawai'i's space on Earth makes us vulnerable to the ecological damage caused by an unhealthy climate system. Recognizing this threat, the Hawai'i legislature recently declared "a climate emergency." S.C.R. 44, S.D. 1, H.D. 1, 31st Leg., Reg. Sess. (2021). It warned that "Hawaii remains particularly vulnerable to the dangers of disaster occurrences as a result of the effects of global warming." Id. The resolution calls for "statewide collaboration toward an immediate just transition and emergency mobilization effort to restore a safe climate." Id.

Here, the record shows that the PUC complied with HRS §§ 269-6(b) and 269-145.5(b). In the Approval Order, the PUC made detailed findings to satisfy these provisions.

First, the PUC reviewed MECO's GHG analysis, methodology, and data. The PUC found that the Project would result in "a significant reduction in Lifecycle and Operational GHG emissions relative to the baseline of no Project." This finding implies that the Project would help protect air and other trust resources affected by anthropogenic global warming.

Second, the PUC evaluated Hawaiʻi's energy policy and the Project's anticipated bill savings. It found that the PPA represented "a significant step not only towards Hawaii's renewable energy goals . . . but also towards lower energy prices."

Third, the PUC considered the benefits of having dispatchable renewable energy, including the increased flexibility and reliability of Hawaiʻi's electric grids.

Fourth, the PUC identified (1) the permits that Paeahu would have to obtain to construct and operate its solar plant; (2) the impact studies[16] related to those permits; (3) which

---

These legislative actions reflect the urgent need to curb greenhouse gas emissions and protect the right to a life-sustaining climate system.

[16] In the Approval Order, the PUC explained that Paeahu filed several studies covering topics including: "traffic, noise, land uses (soils, topography, geology, vegetation), water quality, archaeological impacts, cultural impacts, wildlife, electric and magnetic fields ('EMF'), 'heat island' effects, and glint and glare issues." For each topic, the PUC

agency would review them; and (4) under what statutes, regulations, or ordinances.

The PUC referred to Paeahu's explanation that the studies' intended audience was the permit-issuing agencies with the relevant subject matter expertise. The PUC concluded that those agencies with jurisdiction over the necessary permits would review the impact studies and make permitting decisions. Contrary to Pono Power's claim, the PUC did not merely "catalog[ue]" the requisite permits.

Fifth, the PUC considered Paeahu's efforts to explore an alternative site. Relocating the Project to this alternative site, the PUC found, was not feasible due to archaeological, cultural, and topographical concerns. It "conclude[d] that Paeahu ha[d] made a good-faith effort to minimize the environmental, cultural, and archeological impacts of the Project"; the PUC qualified its conclusion by noting that other permitting agencies would "further review" the Project.

"[U]pon balance of the technical, economic, environmental, and cultural considerations," the PUC found the PPA "in the public interest."

---

identified record-citations where the topic was discussed. Though the PUC omitted the words, "public trust resources," its findings evince meaningful and diligent efforts to appraise the range of trust resources potentially affected by the Project. By doing so, the PUC implicitly identified the scope of the affected public trust resources. The PUC's efforts are consistent with its trustee duties given that the record lacks a reasonable threat to a trust resource.

The PUC did not make explicit findings about its public trust duties in the Approval Order. But its Recon Order concluded that it had fulfilled its public trust duties by satisfying its obligations under HRS §§ 269-6(b) and 269-145.5(b).[17]

Pono Power challenges this conclusion. It claims the public trust doctrine required more: it says the PUC needed to make specific findings about each affected public trust resource. We disagree.

In the Recon Order, the PUC concluded that Pono Power's allegations about the Project's adverse impact on various trust resources were "speculative or unsupported." This determination was not clearly erroneous.

Pono Power participated in the PPA proceedings. It raised concerns about the Project's impacts on the surrounding environment. Those concerns included potential water runoff and damages to native flora.

Pono Power had the chance to boost its claims of harm to trust resources. Yet, Pono Power's support for its position is scant. Pono Power backs up its water runoff allegation with its president's testimony: she saw surface runoff near the Project

---

[17]    We read the Approval and Recon Orders together. Cf. Alaska Dep't of Env't Conservation v. EPA, 540 U.S. 461, 497 (2004) (recognizing that an agency's "skeletal" orders could be "properly read together with accompanying explanatory correspondence" from that agency).

area during moderate storms. She submitted two after-rain photographs and one dry-day photograph of a nearby gulch.

The testimony and photographs showed that water runoff happens in the neighborhood, not whether and how the Project would exacerbate any water runoff issue. Pono Power does not meaningfully explain the connection between the Project and the alleged harm to water resources.

Regarding the potential impact to native flora, Pono Power submitted a four-sentence "Anonymous Note": the note mentioned that wiliwili trees and other native plants grow in unidentified gulches near the Project.[18] It also submitted a general article about wiliwili forest habitat in the nearby area.[19] The Anonymous Note and the article do not reasonably establish a link between the Project and the alleged harm to those trees and plants.[20]

---

[18]    Our discussion of Pono Power's president's testimony and the Anonymous Note is not meant to "discredit" or "devalue" testimony based on personal observation. Rather, it is to point out that the personal observations relied on by Pono Power (the observations that water runoff happens and native vegetation exists in or near the Project area) do not adequately explain how the Project would harm the relevant resources.

[19]    The dissent refers to this article as the "Altenberg report." This report was drafted in 2007 for an unrelated project known as "Wailea 670." That project is "adjacent" to the Paeahu site. So it appears that the report doesn't cover Paeahu's location. Further, even within the Wailea 670 area, the report observed, "the northern 5/6 of [the land was] *devoid* of endemic Hawaiian plants." This suggests that native flora can vary significantly throughout the Wailea region; and that the existence of wiliwili trees in some areas within the proposed project boundaries doesn't necessarily mean they would be harmed.

[20]    Beyond its limited support for the purported harm to trust resources, Pono Power generally questioned Paeahu's impact assessments and best

Pono Power responded to the PUC's conclusion that its allegations were "speculative or unsupported" with an unsupported, conclusory statement: "[t]he harm is presumed because the resources are part of a public trust." This sweeping assertion flops.

We conclude that the PUC properly evaluated Pono Power's allegations of harm. It did not clearly err. Hand-waving without meaningful support cannot establish a "reasonable" threat. The heightened duty to assess and make specific findings about the affected trust resources was not triggered here. And the PUC's statutory balancing sufficiently satisfied its public trust duties.

Pono Power also questions the PUC's recognition of other permitting agencies' "overlapping jurisdiction" regarding the Project. It challenges the PUC's conclusion that those agencies would review Paeahu's impact studies and make permitting decisions based on their expertise and respective statutory and constitutional mandates. By taking this position, Pono Power says, the PUC improperly delegated its public trust obligations. We disagree.[21]

---

management practices. Pono Power's skepticism does not defeat the PUC's factual finding that its allegations of harm were unsupported or speculative.

[21] Pono Power further claims that the PUC improperly delegated its public trust duties by "accept[ing] Paeahu's representations regarding government approvals." Pono Power is correct that an agency cannot delegate its trust duty to a private party. Lāna'ians for Sensible Growth, 146 Hawai'i at 507, 463 P.3d at 1164. But that did not happen here. Though the PUC "accept[ed]"

27

An agency can recognize other agencies' overlapping jurisdiction and their expertise in specific subject matters. See Alaloa v. Planning Comm'n of Maui, 68 Haw. 135, 137, 705 P.2d 1042, 1044 (1985) (opining that the planning commission's permit conditions requiring the applicant to obtain approvals from other agencies (including the State Department of Health) were not an unlawful delegation of duty partly because those agencies "have the expertise and objective criteria" for granting or denying approvals needed for the project's construction).

Further, the PUC's acknowledgement of other agencies' jurisdiction and expertise does not equate to abandoning its own duties. Here the PUC fulfilled its public trust obligations by complying with its statutory duties. Its comment about further oversight mechanisms over the Project's construction and operation was "outside and in addition to" its public trust responsibilities; it does not amount to an improper delegation. Mauna Kea II, 143 Hawai'i at 397-98, 431 P.3d at 770-71.

---

Paeahu's representations about the requisite governmental approvals, it did not take Paeahu's words at face value. The PUC exercised its due diligence by (1) directing Paeahu to file additional studies and (2) reviewed the statutes and other governing laws under which the relevant permitting agencies would examine those studies. The record does not show that the PUC put the ultimate responsibility to protect trust resources on Paeahu.

**IV.**

The PUC lawfully approved the PPA.  We affirm the Approval Order and the Recon Order.

Lance D. Collins,
(Bianca K. Isaki on the briefs)
for Pono Power Coalition

Joseph A. Stewart,
(Bruce Nakamura and Aaron R. Mun on the briefs)
for Maui Electric Company, Limited

Douglas A. Codiga,
(Mark F. Ito on the briefs)
for Paeahu Solar LLC

Ashley K.L. Agcaoili,
(Caroline C. Ishida and Mark J. Kaetsu on the briefs)
for Public Utilities Commission

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Todd W. Eddins

